IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

**DARYL ORTEGA**,

        Plaintiff,

v.                                                                                                          No. CIV 10-998 BB/ACT

**QWEST CORPORTATION and STEVE
KAMINSKI, as an employee of QWEST
CORPORATION**,

        Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on a motion for summary judgment [Doc. 47] filed by the Defendants QWEST Corporation ("Qwest") and Steve Kaminski. Having considered the parties' submissions and the relevant law, the Court will grant the motion for summary judgment and dismiss the case.

### Background

Daryl Ortega, the plaintiff in this action, is a member of an ethnic community of Spanish heritage located in Northern New Mexico. He was hired by Qwest on or about July 12, 1998, to work as a Network Technician in the Taos area. In September 2008, Steve Kaminski was assigned to the Taos area and served as Ortega's direct supervisor.

On October 23, 2009, Kaminski reported an incident of workplace violence and unprofessional behavior by Ortega. Allegedly, Ortega threatened Mike Neely, a technician for a

1

third-party HVAC company.  After the incident, Qwest assigned Daniel Gonzales, an employee in Qwest's Corporate Security Department, to investigate.  Gonzales had no prior experience with Ortega.  As part of the investigation, he interviewed Ortega, Kaminski, and three contractors working for the HVAC company (Mike Neely, Mario Sanchez, and Jeff Eyers).  Doc. 47, Ex. 4, p.2.  Gonzales also collected written statements from Kaminski and the three contractors, but did not request a written statement from Ortega.  *Id.*  Gonzales' Summary of the Investigation details each sides' conflicting accounts of the incident.  *Id.* at pp. 3-6.  It then arrives at two conclusions.  First, the Summary concludes that Ortega violated Qwest's Code of Conduct regarding Threats and Violence in the Workplace by verbally threatening Neely.  *Id.* at p. 4.  Second, the Summary concludes that the conduct of Mario Sanchez, who insulted Ortega, was inappropriate and thus recommends that the incident be brought to the attention of the HVAC company's management.  *Id.* at p. 6.

Based on Gonzales' report, Sarah Nicholls, Qwest's Director of Network Operations at the time, terminated Ortega's employment.  While Nicholls avers that she made this decision based on Gonzales' report, doc. 47, Ex. 6, at ¶ 5, Ortega argues that the decision was actually made during a conference call with three other individuals at Qwest: Kaminski, Donna Kennedy (who reported to Nicholls), and Ms. Fuentes (an employee with the Human Resources Department).  On November 6, 2009, Ortega was officially notified of his termination for unsatisfactory performance regarding professionalism and Qwest's Code of Conduct.  Doc. 47, Ex. 2 (Dismissal Notification).

Thereafter, Ortega's union challenged the termination under the Collective Bargaining Agreement ("CBA") between the union and Qwest.  According to the CBA, the union is the

exclusive representative for issues of terms and conditions of employment, including termination, between employees and Qwest. The grievance went to arbitration as a last, final, and binding step. Ortega's termination was upheld.

Ortega then filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), on March 2, 2010. Doc. 47, Ex. 7. He alleged that he was treated differently from non-Hispanic white employees from July 17, 2009 until his termination. *Id.* He also filed a complaint in this Court on October 21, 2010. Doc. 1. Pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000(e), the Complaint sets forth two federal causes of action against the Defendants Qwest and Kaminski. Count I alleges racial discrimination, harassment and disparate treatment while Count II alleges that Ortega was terminated in retaliation for reporting an incident of racial discrimination to the EEOC in a March 15, 2007 Charge of Discrimination. The Complaint also sets forth a claim for wrongful termination under New Mexico law (Count III).

In support of these claims, the Complaint identifies four specific race-based comments: (1) an unknown employee called him a "beaner" in 2005, (2) Kaminski stated that he wouldn't live in certain areas because there were more Spanish than anglos (the exact time of this incident is unknown), (3) Kaminski voiced his approval of a local inn requiring its Spanish employees to "anglicize" their names (which allegedly happened in 2009), and (4) on July 17, 2009, Kaminski stated that those of Mexican descent were the same to him as those of Spanish descent.

The Complaint further alleges that Ortega was constantly and unfairly criticized by his supervisor, Kaminski. For example, the Complaint alleges that Ortega was disciplined for leaving paperwork unfinished whereas a similarly situated employee, Ron Scott, was not

disciplined for the same conduct. *Id.* at ¶¶ 22-23. The Complaint also alleges that Ortega, unlike other non-Spanish employees, was required to personally contact Kaminski to request a sick day. *Id.* at ¶ 24.

The Defendants move for summary judgment on all three counts. Doc. 47. While Ortega's counsel submitted a response within the time frame agreed to by the parties, he erroneously submitted a brief for another case. Doc. 49. Attached to the erroneous brief was the affidavit that Ortega had executed for this matter. Doc. 49, Ex. 1. Defendants alerted Ortega's counsel to the error. The following business day, Ortega filed an erratum version of his Response by merely copying Ortega's affidavit into a brief. Doc. 50. In their reply, Defendants argue that Ortega waived his opportunity to contest the motion. Defendants further assert that Ortega's allegations do not show discrimination or retaliation by the persons involved in the decision to terminate and do not support a claim of race-based harassment.

**Standard of Review**

Federal Rule of Civil Procedure 56 governs summary judgment motions. Summary judgment is appropriate "if the pleading, depositions, answer to interrogatories, and admissions on file, together with the affidavits … show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Medina v. Income Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 45(c)). If the moving party is able to meet this burden, then the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986). The non-moving party may not rely upon the allegations in the pleading, but, at a minimum, must show an inference of the existence of each essential

4

element of the case. *Eck v. Parke, Davis & Co.*, 236 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Husley v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). In deciding a summary judgment motion, the Court views the evidence and draws all inferences in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587.

### Analysis

**I. Ortega did not waive his opportunity to respond to the motion**

As a preliminary matter, the Court must decide whether to consider Ortega's response to the motion for summary judgment. As indicated, this is not a case where Ortega failed to file a response. Rather, on November 10, 2011 – the date a response was due – Ortega erroneously filed a response brief concerning Michael Trujillo. Doc. 49. Attached to the Trujillo brief was the affidavit of Daryl Ortega. Doc. 49, Ex. 1. When alerted to this error, counsel for Ortega promptly filed an erratum response brief the following business day. *See* Doc. 50. The response brief, which simply incorporates Ortega's affidavit, contests a number of the material facts set forth in Defendants' motion for summary judgment.

Pursuant to D.N.M. LR-Civ. 7.1(b), the Court may treat an issue to which no timely response is made as unopposed and resolve the issue in favor of the moving party. The Tenth Circuit has, however, emphasized that "a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party." *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). Thus, although the court may consider a motion to be uncontested for lack of a timely response, it may not grant summary judgment under Rule 56(c) unless the moving party has met its initial burden of production and demonstrated its entitlement to judgment as a matter of law. *Id.* at 1194-95 (10th Cir. 2002); *see*

*also Issa v. Comp USA,* 354 F.3d 1174, 1177-78 (10th Cir. 2003) (holding that a court must address the merits of a motion to dismiss notwithstanding the plaintiff's failure to respond). Interpreting D.N.M LR-Civ 7.1(b), this Court "treats an issue to which no timely response is made as unopposed and resolves the issue in favor of the moving party *unless it would be incorrect or improper to do so.*" *Baumeister v. New Mexico Comm'n for the Blind*, 425 F. Supp. 2d 1250, 1268 (D.N.M. 2006) (emphasis added). Under the circumstances of the instant case, it would be incorrect for the Court to accept as undisputed all of the material facts set forth in Defendants' motion. *See Sutton v. Corrections Corp. of America*, 2008 WL 2797008, at * 2 (D. Colo. July 17, 2008).

## II.  Federal Claims

Ortega brings this action pursuant to Title VII , 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981, alleging that he was subject to discrimination and retaliation because of his race. Ortega does not present any direct evidence of racial bias, relying instead on indirect evidence from which, he contends, a trier of fact could infer discriminatory intent. *See Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 855 (10th Cir. 2007) (discussing the distinction between direct and indirect evidence of discrimination). Accordingly, his claims for discrimination and retaliation are both subject to the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1]

The *McDonnell Douglas* framework provides a three-step analysis for determining whether a plaintiff survives a motion for summary judgment. First, the plaintiff must prove by a

---

[1] Both Title VII and Section 1981 claims are analyzed under the burden-shifting scheme originally developed in *McDonnell Douglas*. *See Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995) (explaining that the *McDonnell Douglas* burden-shifting analysis applies to discrimination claims brought pursuant to Title VII, § 1983, and § 1981).

preponderance of the evidence a prima facie case of discrimination. *Id.* at 802. Second, after the plaintiff establishes his prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the employee's termination. *Id.* "Upon the employer's articulation of legitimate, nondiscriminatory reasons, the presumption of discrimination established by the prima facie case simply drops out of the picture." *Kelly v. City of Albuquerque,* 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004) (quotations omitted). Finally, the plaintiff is given the opportunity to show that the reasons proffered by the defendant for the termination are a pretext for unlawful discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If there is an issue of fact as to whether the "defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the fact finder." *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995)

### A. Disparate Treatment Claim

The Complaint states a claim for disparate treatment on the grounds that Ortega was disciplined more severely than non-Spanish employees as a result of Kaminski's racial bias. To establish a prima facie case of disparate discipline, Ortega must prove by a preponderance of the evidence that (1) he is a member of a protected class, (2) he was disciplined by Qwest, and (3) Qwest imposed the discipline under circumstances giving rise to an inference of racial discrimination. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000).

Here, the first two requirements are not disputed: Ortega is a member of an ethnic community of Spanish-speaking persons of Spanish heritage and suffered an adverse employment action when he was terminated on November 6, 2009. The issue then is whether Ortega can generate an inference that the termination decision was racially motivated.

Courts have articulated a variety of circumstances that can give rise to an inference of discriminatory motive. *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). One of the ways a plaintiff may establish an inference of racial discrimination is by showing that the employer treated similarly situated employees differently. *Jones*, 203 F.3d at 753; *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). For the treatment of another employee to be evidence of discrimination, the other employees must have been similarly situated, which means that "they deal[t] with the same supervisor, [we]re subjected to the same standards governing performance evaluation and discipline, and [were] engaged in conduct of comparable seriousness." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007). Here, Ortega identifies two scenarios where other non-Hispanic employees were treated differently from him. First, he alleges that Kaminski failed to discipline other non-Hispanic employees, such as Ron Scott, for leaving paperwork and service calls unfinished. Doc. 1, ¶¶ 22-23. By contrast, Ortega alleges that he was routinely criticized for such failures. Next, Ortega alleges that he, unlike other Non-Hispanic employees at the Taos office, was required to personally contact Kaminski before calling in sick. *Id.* at ¶¶ 24-25. He was then reprimanded for failing to call in sick, something that apparently did not happen to other employees in similar circumstances. *Id.*

Ortega further alleges that Kaminski harbored a racial animus towards all Hispanics. "[A]ctions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" may suffice to establish an inference of discriminatory motive. *Plotke*, 405 F.3d at 1101 (quotations omitted). Ortega thus identifies some, albeit quite thin, evidence of racial bias or animus on the part of Kaminski. First, it is undisputed that Kaminski stated that he

8

did not want to live in an area with too many Hispanic persons.  Second, on one occasion in 2009, Kamiski agreed with the decision of a local business manager to require Hispanic employees to Anglicize their names when working at that business.  Finally, when confronted by Ortega about his racial bias towards Hispanics, Kaminski responded that he liked Mexicans and further continued to equate Mexicans and Spaniards.

It is unclear whether these statements constitute legal evidence of racial animus.  For example, the fact that Kaminski stated that he liked Mexicans and then proceeded to equate Mexicans and Spanish does not strike the Court as reflecting racial animus.2  Nonetheless, at the present point, the Court concludes that Ortega has presented sufficient evidence, may that be the disparate-treatment allegations or Kaminski's remarks, "tending" to create a reasonable inference of discriminatory animus.  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1116 (10th Cir. 2007); *see also Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (noting that the burden to establish a prima facie case under the *McDonnell-Douglas* framework is not an onerous one).  Furthermore, Ortega alleges that Kaminski participated in the decision to terminate him.[3]  While Qwest argues that Kaminski harbored no racial bias, that he was not involved in the termination decision, and that Nicholls had a legitimate, nondiscriminatory reason for terminating Ortega, those arguments are "more properly considered in determining whether Plaintiff can prove that Defendant's reasons for his termination were pretextual." *Bowdish v. Fed. Express Corp.*, 699 F. Supp. 2d 1306, 1320 (W.D. Okla. 2010).  Accordingly,

---

2. For example, the U.S. Census reports its data by "Hispanic or Latino origin."
3. Ortega alleges in his complaint that "the assignment of Defendant Kaminski as the Plaintiff's supervisor included a mandate to find a reason to terminate [Ortega's] employment in retaliation for his opposition to discriminatory acts in the workplace and his union activities . . . ."  Doc. 1, ¶ 39.  While Ortega does not rely on this allegation to oppose the motion for summary judgment, it would appear to suggest that Kaminski may have played a role in Ortega's termination.

the Court concludes, at this point, that Ortega has established a prima facie case of racial discrimination.  *Id.*

The Court must therefore consider whether Qwest has articulated a legitimate, nondiscriminatory reason for terminating Ortega.  *McDonnell Douglas Corp.*, 411 U.S. at 802. On this point, it is undisputed that Gonzales, who harbored no racial bias, was appointed to conduct an investigation into the incident between Ortega and the HVAC contractors.  While Ortega alleges that the investigation was not "fair" or "professional" – apparently because Gonzales interviewed Ortega, but failed to ask him for a written statement – such allegations do not suggest any racial bias or animus.  There is therefore no material dispute of fact regarding Gonzales' ultimate conclusion that Ortega violated Qwest's Threats and Violence in the Workplace policy.  Based on this conclusion, Nicholls then made a decision to terminate Plaintiff's employment.  There are no allegations that Nicholls herself harbored a racial bias. Qwest has thus articulated a nondiscriminatory reason for Ortega's termination.  Accordingly, Ortega "can avoid summary judgment only if he is able to show that a genuine dispute of material fact exists as to whether the defendants['] articulated reason[s][are] pretextual."  *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1165 (10th Cir. 2000) (quotes omitted).

A plaintiff can demonstrate pretext by showing "either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."  *Jones*, 54 F.3d at 632.  In so showing, a plaintiff need not disprove a defendant's reasons or demonstrate that race was the only factor, but the plaintiff must show that race "actually played a role in the decision-making process and had a determinative influence on the decision."  *Id.*

10

In this case, Ortega disputes a number of material facts in an attempt to preclude summary judgment. Specifically, he asserts that Nicholls did not make the decision to terminate on her own. Apparently, during the union arbitration, Kaminski stated that he, Sarah Nicholls, Kennedy, and a human resources employee all made the decision to terminate Ortega's employment on a conference call. Ortega relies on this statement for the theory that Nicholls merely served as a rubber stamp for Kaminski's or Kennedy's alleged discriminatory motive for terminating Ortega. According to this theory, Nicholls' termination of Ortega for violence and threats was merely pretextual.

Under the "rubber stamp" doctrine, a plaintiff can bring a Title VII claim when "a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004)). The Tenth Circuit has noted that "[t]o recover under this theory, the plaintiff must show that the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee." *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (quotations omitted). Twice, the Tenth Circuit has rejected a rubber-stamp theory where the supervisor conducted an independent investigation of the facts, "rather than relying entirely on the recommendation of the biased subordinate." *E.E.O.C.*, 450 F.3d at 485 (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231-32 (10th Cir. 2000), and *English*, 248 F.3d at 1011). The Tenth Circuit has further held that a plaintiff, to prevail on a claim of rubber-stamping, must show that a biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse

11

employment action. *Id.* at 487.

Here, it is undisputed that Nicholls was actively involved in the decision to terminate Ortega. She reviewed the recommendations of Gonzales' independent investigation and relied on Gonzales' Summary in deciding to terminate Ortega. Where, as here, Nicholls was actively involved in the decision to terminate and relied on an independent investigation, it cannot be said that she merely served as a rubber-stamp. *E.E.O.C.*, 450 F.3d at 485; *see also Hamby v. Associated Centers for Therapy*, 230 Fed. Appx. 772, 780 (10th Cir. 2007) (although the subordinate was involved in the termination decision, the supervisor was also actively involved and conducted an independent investigation; thus, the supervisor was not merely a "rubber stamp"). Put another way, Ortega has failed to establish that Kennedy or Kaminski – assuming that they harbored a racial bias[4] – caused the decision to terminate. Because Ortega has failed to demonstrate that Qwest's reason for terminating him – that he threatened the HVAC contractor Neely in violation of Qwest's code of conduct – was pretextual or unworthy of belief, his disparate treatment theory fails.

### B. Harassment Claim

Ortega argues that he was subject to harassment in the form of race-based comments and repeated discipline. "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Title VII, however, only protects employees from severe or pervasive workplace conduct that affects the terms, conditions, or privileges of employment. *See id.* at 67. Ortega therefore survives summary judgment by showing "that under the totality of the circumstances

---

4 Ortega alleges that Kennedy harbored a racial bias due to his comment that Ortega lived in Questa, a "shanty town." No racial component is obvious from this remark.

(1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege[s] of employment, and (2) the harassment was racial" or based on national origin. *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (quotation omitted).

Ortega identifies four race-based comments in support of his claim of harassment. These include, as identified above, an unknown employee's remark at sometime in 2005 that Ortega was a "beaner," Kaminski's statement that he liked Mexicans and Spanish alike, Kaminski's approval of a Taos-area employer who required employees to anglicize their names, and Kaminski's comment that he had to live in Red River or Angel Fire because there were more Anglos than Hispanics there. These four comments, spanning a four-year period, do not rise to the level of "a steady barrage of opprobrious racial comments." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). At the most, they represent a few isolated incidents of racial enmity and thus fall short of showing pervasive or severe harassment. *Id.* (10th Cir. 1994) (two overtly racial remarks (the Ku Klux Klan comment and the use of the term "nigger") and one arguably racial comment (sad face cartoon) over an eight-year period insufficient to be actionable).

Ortega further alleges that he was subject to scrutiny and reprimand on numerous occasions because of Kaminski's racial bias. A supervisor's enhanced monitoring of an employee may be sufficiently severe to create a hostile work environment. *McGriff v. Am. Airlines, Inc.*, 431 F. Supp. 2d 1145, 1153 (N.D. Okla. 2006). While Ortega identifies two incidents of discipline or increased scrutiny – when he left paperwork unfinished and the requirement that he call Kaminski before taking a sick day – there is nothing to suggest that such scrutiny, even if there was evidence of racial motivation, rose to the level of pervasive or severe harassment. *Trujillo*, 157 F.3d at 1214; *Olivarez v. Centura Health Corp.*, 203 F. Supp. 2d 1218,

13

1223-24 (D. Colo. 2002) (three incidents of discipline over an unidentified time-frame did not rise to the level of pervasive or severe harassment). What is more, the Court will not "vilify every supervisor that implements a policy with which an employee disagrees or that monitors [his] employees' conduct." *Trujillo*, 157 F.3d at 1214. This stance is particularly appropriate here where Ortega admits that he received five written warnings over the last two years of his employment. *See Bateman v. United Parcel Serv., Inc.*, 31 Fed. Appx. 593, 598 (10th Cir. 2002) (noting that plaintiff's allegations of excessive scrutiny "amount to no more than routine employee monitoring or a disagreement with her supervisor").

In light of the totality of the circumstances, the Court concludes that Ortega has failed to show that he was subject to a hostile work environment.

**C. Retaliation Claim**

Ortega alleges that he was retaliated against for reporting instances of racial misconduct by Qwest employees in violation of Title VII, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981. In order to show a prima facie case of wrongful retaliation, the plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged activity materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009). Defendants concede that Ortega meets the first part of this test: Ortega engaged in a protected action when he filed a charge of discrimination on March 15, 2007 regarding Kaminski's discriminatory behavior. Defendants argue, however, that Ortega cannot show any indication that he suffered an adverse employment action – in this case, termination – as a result of filing the charge.

14

The Court agrees. Ortega filed a charge of discrimination on March 15, 2007 and was not terminated until November 2009. Ortega does not identify any direct or circumstantial evidence to link these two events. Nonetheless, "the required link between the protected activity and subsequent adverse employment action can be inferred if the action occurs within a short period of time after the protected activity." *McGowan v. City of Eufala*, 472 F.3d 736, 744 (10th Cir. 2006). The Tenth Circuit has held that "a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted). Here, two and a half years lie between Ortega's termination and his previous instance of reporting racial misconduct. Moreover, during this timeframe, Ortega worked for three other supervisors before Kaminski arrived on the scene in 2008.[5] Due to this significant time gap and the turnover in management, the Court finds that Ortega has failed to show a causal connection between the report of discrimination in 2007 and the termination in 2009. The Court will therefore grant Defendants' motion for summary judgment regarding the claim of retaliation.

**II. State Claim: Wrongful Termination**

Count III of the Complaint sets forth a state-law claim of wrongful termination. In their motion for summary judgment [Doc. 47], Defendants argued that Ortega cannot bring this claim because he was not an at-will employee and had an alternative grievance procedure under a collective bargaining agreement ("CBA"). In his response, Ortega does not dispute that the CBA between his union and Qwest made the union "the exclusive representative" on issues of termination. Nor does Ortega dispute that his union pursued a grievance regarding his

---

5 The intervening supervisors were: Raymond Wheeler from September 2006 to November 4, 2007; Corey Murdock from November 4 until December 30, 2007; and Craig Wood from December 30 until September 7, 2008.

termination which resulted in the termination being upheld in arbitration.

While New Mexico law has recognized an employee's right to bring a wrongful termination claim, that right has been limited to at-will employees. *Silva v. Am. Fed'n of State, Cnty. and Mun. Employees*, 2001-NMSC-038, ¶ 1, 131 N.M. 364, 365, 37 P.3d 81, 82 (holding that a plaintiff who is not an at-will employee cannot pursue an action of retaliatory discharge); *Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp.*, 106 N.M. 19, 20, 738 P.2d 513, 515 (1987) (holding that if an employee is protected from wrongful discharge by an employment contract, the intended protection afforded by the retaliatory discharge action is unnecessary and inapplicable). Furthermore, New Mexico law has recognized that employees whose employment is governed by a CBA, which only permits an employee to be terminated for cause and provides a grievance procedure if an employee believes he was terminated unfairly, is not an at-will employee and cannot recover damages under the tort of retaliatory discharge. *Weise v. Wash. Tru Solutions, L.L.C.*, 192 P.3d 1244, 1254 (N.M. App. 2008). Since Ortega's employment with Qwest was governed by a CBA that allowed termination only for cause and a grievance procedure for those believing that they were terminated unfairly, the tort of wrongful termination is not available. As such, the Court grants summary judgment in favor of the Defendants on Count III of the Complaint for wrongful termination.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment; thus, the case is dismissed.

Dated this 6th day of June, 2012.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE